PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* VÍCTOR MIRAYES, Defendant and Appellant.

No. 6649. Argued July 20, 1937.—Decided November 23, 1937.

*Carlos Santana Becerra* for appellant. *R. A. Gómez,* Prosecuting Attorney, for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

A complaint against Víctor Mirayes was filed in the Second Section of the Municipal Court of San Juan, which in part, reads as follows:

"I, Secundino Pérez Sánchez, Detective I. P., resident of Santurce, San Juan, Ponce de León Avenue, number 181, more than 21 years of age, file complaint against Víctor Mirayes, for an offense of libel, committed in the following manner: That on February 29, 1936 and on Ponce de León Avenue in Santurce, San Juan, of the Municipal Judicial District of San Juan, which forms part of the Judicial District of San Juan, P. R., the aforesaid defendant, then and there, unlawfully, wilfully and maliciously and with criminal intent to impeach the honesty and integrity of the Hon. Blanton Winship, Governor of Puerto Rico, exposing him to public contempt, published, distributed, and caused to circulate a handbill with the title "Latest News," containing among others, the following statements:

" 'AWAY WITH WINSHIP . . . Commander of the Assassin Forces of Puerto Rico.—Recent events make even more manifest the incompetency of the magpie in the Fortaleza, the supreme General (read, most abusive) STICK WINSHIP and so forth.—Little Winchie now adds another stupidity to the many of which he has already been guilty: He now bellows for the restoration of the death penalty in Puerto Rico. Get out, Winship! That is all right for your country, where lynchings are your favorite dish; but here in Puerto Rico, we

are a little more civilized. Be still, Winship, be still! Rather than utter nonsense, don't talk!'

"That said handbill was published, distributed, and caused to circulate immediately following the events in the headquarters of the Insular Police in this Capital, where the two young men, Elías Beauchamp and Hiram Rosado, lost their lives through shots fired at them by the police, and with the malicious intent of charging the Honorable Governor of Puerto Rico with having ordered the death of said young men. All contrary to law."

When the record had been filed in the district court, Mirayes moved that the last paragraph of the complaint be stricken out. The case came on for trial, and the defendant insisted upon his motion to strike out. The prosecuting attorney objected to the motion, and the court made a ruling as follows:

"Let us hear the evidence, and the court will study the question. If it is immaterial, it will not be taken into consideration.

"The court for the present denies the motion, so that it may be considered later when the case is decided. If it is immaterial, I will so hold.

"Let us hear the evidence, and the Court will decide this question later."

Neither of the parties objected, and the first witness for the prosecution, Secundino Pérez, was called, who testified that on February 29, 1936, Mirayes was selling in Santurce, San Juan, "these handbills at two cents a piece.... various persons were purchasing them." The prosecuting attorney then stated, "I am going to offer this handbill in evidence," and counsel for the defendant made the following objection:

"Q. Who do you say took this handbill?

"A. Different people, among them Luis Benítez, the assistant chief of the detectives... He gave it to Judge Fernández who was registering the Regional Party in Santurce, in the police headquarters there at that time.

"Defense: There is no objection to the admission of this sheet.

"Judge: Admitted without objection, and marked 'Exhibit No. 1' for the People."

The original sheet thus admitted in evidence has been brought before this Court. Immediately after the part copied in the complaint, it contains the following language:

"AWAY WITH VÁZQUEZ! BEAUCHAMP ASSASSINATED! The consensus of public opinion with regard to the death of the young men Elías Beachamp and Hiram Rosado is showing itself increasingly bitter against the members of the police in whose custody they were, particularly against Chief Vázquez.

" · · · · · · · · · ·

"To characterize the death of Beauchamp and Rosado, there is only a single word: ASSASINATION!"

The second and last witness for the People, Luis Benítez, was called, and he testified as follows:

"I went toward the police headquarters where I have my office and saw that a handbill was being circulated; I got one, and on reading it, I noticed that it was written in terms injurious to the Governor of Puerto Rico, and at the same time I noticed that it had no printer's mark. I then ordered detective Pérez Sánchez to arrest the person who was distributing these sheets, and it happened that when he was taken to headquarters, Municipal Judge Victoriano Fernández was there. I asked him who had written the sheet . . . and he told me that the sheet was his; that he had done it, that he had his address printed on the sheet itself, his name, that he recognized that he was responsible, that he was not looking for anybody else to take the responsibility for it. The judge then ordered a study to be made of the case for the preparation of a proper complaint.

"Prosecuting attorney: What had happened a few days before in the police headquarters in San Juan?

"Defense: Your Honor, we are going to object because we believe it immaterial, and in order to be consistent with the question of law which we have raised.

"Judge: The court will permit the question.

"Defense: Exception.

"Prosecuting attorney: What had happened a few days before in the police headquarters in San Juan?

"Witness: Some days before there had occurred those events of the . . .

"Prosecuting attorney: What were the events? Who had died there in headquarters?

"Witness: Some nationalist boys.
"Prosecuting attorney: What were their names?
"Witness: Beauchamp and Rosado."

When the witness concluded, the prosecuting attorney stated: "That is our case, your Honor." Counsel for the defendant then said:

"Your honor, we to are going to submit the case, with the following question which we raise: Independently of the question of innuendo, which we have already discussed, and which allegation we contend is immaterial and entirely impertinent, and a mere legal conclusion of the complainant unsupported by the text of the alleged libel, we believe that if the allegations as to the libel are considered in themselves, sufficient facts are not stated to constitute the offense of libel. We base ourselves on the doctrine laid down by our Supreme Court in the case of *People* v. *López,* reported in 23 P.R.R. 106."

The court announced that a decision would be handed down on the following day. This was done, and the court found the defendant guilty of the offense of libel with which he was charged, and sentenced him to one year in jail, and to the payment of costs.

Mirayes appealed to this Supreme Court, and in his brief he assigns two errors which in his opinion were committed by the court in overruling his motion to strike out, and in refusing to discharge him on the ground that the publication was not libelous.

■■ Section 243 of the Penal Code reads as follows:

"A libel is a malicious defamation, expressed either by writing, printing, or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue, or reputation, or publish the natural or alleged defects of one who is alive, and thereby to expose him to public hatred, contempt or ridicule."

Section 245 of the same code provides:

"An injurious publication is presumed to have been malicious if no justifiable motive for making it is shown."

The defendant has presented no evidence showing justification. The evidence of the prosecuting attorney was admitted with the single objection which we have mentioned, and which in our opinion is unfounded. There remains the publication made by the defendant as set forth in the complaint and more completely still in the handbill.

Does the matter published in the handbill constitute a malicious defamation tending to impeach the honesty, integrity, virtue, or reputation of Governor Winship?

An affirmative answer is unavoidable. The publication commences by charging the Governor with being the ''Commander of the Assassin Forces of Puerto Rico,'' immediately after having characterized as an assassination a concrete act attributed to members of such forces, that is, ''of the Uniformed Forces,'' or in other words, of the Insular Police, the supreme directive authority of which resides in the Governor according to law. Section 2077, Revised Statutes of Puerto Rico, Compilation of 1911, page 398. Could one perhaps be considered as a person of honesty, integrity and virtue who commands an organization of assassins? Could one who did so keep his reputation? Clearly not, and it is consequently a necessary conclusion that the charge not only tends to, but does, impeach maliciously the honesty, integrity, virtue and reputation of Mr. Winship, Governor of Puerto Rico.

If in addition to that, consideration is given to the charges which follow and the manifestly degrading and injurious way in which they appear to have been drafted, the conclusion which we have reached becomes even more inevitable.

The right to a free expression of one's thoughts can afford no protection to excesses such as this. What the defendant has done constitutes a more serious attack than if he had perhaps wounded the body of his victim. He has wounded his reputation, which is part of his life, and which the law ought to protect, and does protect, to the same extent as it protects his body.

The case of *People* v. *López,* 23 P.R.R. 106, cited by appellant, is not in point. The Court was there obliged to hold that the offensive language used fell squarely within the principles laid down in the case of *People* v. *García,* 21 P.R.R. 153, in which the Court, speaking through Mr. Justice Hutchison, used words carrying a warning which ought in their upright meaning be engraved on the public conscience, a warning of that moral sanction which the courts, impelled by a spirit of justice, sometimes make bold to apply where the legal penalties which have been invoked, fail. The Court said:

"It is a curious coincidence that the abusive language imputed to defendant falls so squarely within the rule laid down in *People* v. *García,* 21 P.R.R. 153, relied upon by him, as to suggest a deliberate design and malignant purpose to go as far as might be done with safety under the protection of the view of such matters taken in that case. But it is not within the province of the courts to prescribe the remedy for any evil tendency even though the symptoms indicate a faulty assimilation of fundamental principles judicially proclaimed. Nor need we dwell at length upon the facts stated in the complaint. The words imputed to defendant, pronounced at a most critical moment under circumstances that are matter of common knowledge, public notoriety and contemporaneous history, of which we take judicial notice without mention of details, sufficiently characterize both the speaker and his act in giving utterance thereto; and comment upon such conduct is superfluous. And, if he spoke not merely for himself but also in a representative capacity, then the stigma so stamped upon his sponsors is likewise a matter in which we need feel no concern. The hard school of experience is the only hope of salvation, for those who tolerate such a mouthpiece."

Apart from the fact that in the cases of *People* v. *García, supra,* and *People* v. *López, supra,* to offense of slander was directly charged, made the act to define and punish the crime of slander, approved March 9, 1911 (Penal Code, 1937 ed., page 172), here there is directly charged an offense of libel as defined in Section 243 of the Penal Code. It is apparent that a statement in a printed leaflet caused to be circulated

by its author that the Governor of the Island is the "Commander of the Assassin Forces of Puerto Rico," is not an expression of a more or less injurious opinion with respect to a public officer, but is a report of something about such officer, attributing to him, maliciously and publicly, something which tends to dishonor and discredit him and to expose him to contempt.

■■ With respect to the striking out of the innuendo, it will be sufficient to say that even though it should be held that as drafted the averment is not entirely supported by the facts set forth in the body of the complaint, the error, if any, would not be prejudicial, since the judgment of conviction was not based on the innuendo, but on statements made by the defendant according to the complaint, and as established by the evidence. Furthermore, this is a complaint, and "we have heretofore repeatedly held that the rules governing informations will not be rigidly enforced when invoked as applicable to an ordinary complaint," as we have just stated in the case of *People* v. *Cintrón,* decided today (*infra,* page 322).

The judgment appealed from must be affirmed.

Mr. Justice Córdova Dávial took no part in the decision of this case.